# In the United States District Court for the Southern District of Georgia Brunswick Division

FILED
John E. Triplett, Acting Clerk
United States District Court

By CAsbell at 11:31 am, Jan 14, 2021

JENNIFER L. O'NEAL,

    Plaintiff,

    v.                         2:19-cv-067

SOUTHEAST GEORGIA HEALTH SYSTEM,

    Defendant.

## ORDER

Before the Court is Defendant Southeast Georgia Health System's Motion for Summary Judgment (the "Motion"). Dkt. No. 50. For the reasons stated below, Defendant's Motion is **GRANTED**.

## BACKGROUND[1]

Pro se Plaintiff Jennifer O'Neal ("Plaintiff") was employed by Defendant Southeast Georgia Health System ("Defendant") from June 2011 until her resignation on May 23, 2018. See Dkt. No. 50-2 ¶¶ 1, 35-36. Defendant is a Georgia non-profit corporation with its principal office in Brunswick, Georgia. Dkt. No. 13-1 ¶ 3. Defendant is the parent company to Cooperative Healthcare Services, Inc., which owns and operates several physician

---

[1] Plaintiff did not respond to or otherwise controvert Defendant's Statement of Undisputed Material Facts, so all material facts set forth in Defendant's statement are deemed admitted. See S.D. Ga. LR 56.1.

practices, including the practices where Plaintiff worked. Id. ¶¶ 4, 7. Before assuming the role from which she resigned in 2018, Plaintiff worked as a Medical Office Assistant (an "MOA") in Defendant's Summit Sports Medicine and Orthopaedic Surgery practice, Neurosciences practice, and Glynco Immediate Care practice. Dkt. No. 50-2 ¶¶ 1, 4; Dkt. No. 52 at 117.

In October 2016, while she was an MOA at Glynco Immediate Care, Plaintiff began picking up shifts at Defendant's Endocrinology practice when it needed extra coverage. Dkt. No. 50-2 ¶ 5. At all relevant times, Cassandra McMillan ("McMillan") was the Manager of Physician Practices for Endocrinology. Id. ¶ 7. In May 2017, Plaintiff brought issues she found regarding Endocrinology patients' prescriptions to McMillan's attention. Id. ¶¶ 6-8, 39; Dkt. No. 52 at 12-14. Plaintiff and McMillan discussed these issues and McMillan attempted to address them. Dkt. No. 50-4 ¶ 5. In June 2017, McMillan contacted Plaintiff about an available Department Support Coordinator ("DSC") position in Endocrinology. Dkt. No. 50-2 ¶ 10. The DSC is the senior administrative role within Endocrinology and is responsible for on-site coordination and scheduling of the MOAs within the practice. Id. ¶¶ 15, 68. McMillan believed Plaintiff performed well as an MOA and encouraged Plaintiff to take the DSC position. Id. ¶¶ 9, 11. Plaintiff was hesitant to take the position because she believed there was a high volume of patient issues and

2

complaints in the Endocrinology practice.  Id. ¶¶ 11-12.  After further encouragement from McMillan and an Endocrinology doctor, Plaintiff eventually accepted the position and began working as the Endocrinology DSC on July 16, 2017.  Id. ¶ 13.  As DSC, Plaintiff's direct supervisor was McMillan.  Id. ¶ 14.

In August of 2017, Plaintiff brought another issue concerning patients' prescriptions to McMillan's attention.  Id. ¶ 40.  In September or October 2017, Plaintiff began to have health issues, including numbness on one side of her body, tingling in her hands, and difficulty breathing.  Id. ¶¶ 54-55.  Plaintiff told McMillan about these health issues at some point between September and November 2017.  Id. ¶ 55.  On September 27, 2017, Plaintiff called Defendant's compliance hotline to report issues with an MOA named Katrina Thomas, who Plaintiff alleged "created a hostile work environment in the way she treats co-workers and providers."  Id. ¶ 42; Dkt. No. 52 at 145.  On October 4, 2017, Plaintiff told McMillan via text message that she was having a "change of heart" about the DSC position because of problems she was having with a different MOA, Tashina.  Dkt. No. 50-2 ¶ 17.  McMillan responded to Plaintiff: "Please don't throw in the towel. This is something we can work out."  Id. ¶ 18.  Plaintiff decided to stay as DSC. Id. ¶ 19.  On October 23, 2017, Plaintiff had a meeting with McMillan and the Director of Physician Practices, Adam Brown, to discuss the issues with prescriptions and MOAs Plaintiff was

reporting from the Endocrinology practice.  Dkt. No. 52 at 24-25.
On October 31, 2017, McMillan provided Plaintiff with a
"Performance Improvement Coaching Form," which described areas in
which Plaintiff could improve as DSC, including collaboration,
communication, composure, and completion of requests and tasks.
Id. ¶¶ 20-21; Dkt. No. 52 at 147.  McMillan met with Plaintiff to
review this coaching form and requested weekly check-in meetings
to discuss Plaintiff's progress.  Dkt. No. 50-2 ¶¶ 21, 23.
Plaintiff's health problems worsened in November 2017.  Id. ¶ 54.

On January 21, 2018, Plaintiff made another call to the
compliance hotline to report issues with patients' prescriptions
not being authorized and doctors' not being properly credentialed.
Id. ¶¶ 43—44.  On January 23, 2018, McMillan emailed Human
Resources a draft of Plaintiff's disciplinary document along with
notes on Plaintiff's performance that McMillan had compiled since
the beginning of January.  Id. ¶ 24.  Among the issues McMillan
describes in the disciplinary document are Plaintiff's failure to
attend a mandatory meeting, failure to respond to emails and follow
through with requests, and speaking negatively in the office about
the practice.  Dkt. No. 50-4 at 32-33.  That same day, January 23,
2018, Plaintiff canceled a weekly progress meeting with McMillan
because she had chest tightness, a migraine, and felt "drained."
Dkt. No. 50-2 ¶ 61.  Plaintiff picked up a Family and Medical Leave
Act ("FMLA") packet from Human Resources before clocking out that

4

evening.  Id. ¶¶ 62-63.  The next day, January 24, 2018, Plaintiff faxed McMillan a note informing McMillan of her "request for FMLA/Leave of Absence" because of Plaintiff's "medical issues and concerns."  Dkt. No. 53 at 54.  Plaintiff told McMillan in this note that she had a doctor's appointment the next day "regarding [her] complications."  Id.  Plaintiff met with McMillan later that day for her weekly check-in, during which Plaintiff told McMillan that she planned to have her doctor complete paperwork so she could apply for FMLA.  Dkt. No. 52 at 38.  Plaintiff alleges that McMillan told her "[she] would not qualify for FMLA" and "[i]f [Plaintiff] proceeded to do FMLA, that [Plaintiff's] job was not going to be held for [her]."  Id.  McMillan denies this and says she "told [Plaintiff] that [she] do[es]n't handle FMLA and directed [Plaintiff] to Human Resources . . . for guidance."  Dkt. No. 50-4 ¶ 18.  Plaintiff also claims that at this meeting, she requested a flexible work schedule wherein she could come in late and leave early and take time off to go to doctors' appointments.  Dkt. No. 50-2 ¶¶ 64-65.

Plaintiff met with her primary care doctor, Dr. Dohn, on January 25, 2018.  Id. ¶¶ 56-58.  Plaintiff claims that Dr. Dohn prescribed her Trintellix, Xanax, and Lisinopril at this appointment and encouraged Plaintiff to try calming and breathing techniques.  Id. ¶ 59.  The doctor's notes from this appointment read: "Problem: Stressful job – having panic attacks . . . feels

like she can't breathe . . . 'on edge of cliff'" and "[h]ad long discussion regarding her job + what sounds like a terrible working environment which is requiring her to compromise her integrity." Dkt. No. 52 at 148. Dr. Dohn did not write anything beside "Rx Given:" on this medical record.[2] Dkt. No. 52 at 148. Within the "Review of Systems" section of the record, Dr. Dohn circled "[weight] loss," "sinus problems," and "stress," and he underlined "anxiety attacks."[3] Dkt. No. 52 at 148. Dr. Dohn did not complete the FMLA paperwork at this appointment,[4] nor did Plaintiff ever submit it to Human Resources. Dkt. No. 50-2 ¶¶ 70-71.

When Plaintiff came back to work on January 25, 2018, McMillan asked Plaintiff if she would like to transfer from her DSC position to a vacant MOA position in Endocrinology. Id. ¶ 69. McMillan then invited Plaintiff to sit in on an interview with a candidate for this vacant MOA position should Plaintiff decide not to take it. Dkt. No. 52 at 68. McMillan told Plaintiff that this candidate would also like a management position if it became available. Dkt.

---

[2] Plaintiff saw a different doctor, Dr. Marsha Certain, on April 20, 2018, and Dr. Certain's notes from this appointment list the medications Plaintiff alleges Dr. Dohn prescribed her as "Current Medications." Dkt. No. 10-2 at 6-8.

[3] Plaintiff saw Dr. Dohn again on June 18, 2018, which was after Plaintiff had already resigned from Defendant's employment. Dkt. No. 53 at 133. At this appointment, Dr. Dohn explicitly diagnosed Plaintiff with depression, anxiety, and stress, and prescribed Plaintiff Trintellix for depression and Xanax for anxiety. Id.

[4] It appears that Dr. Dohn filled out the FMLA paperwork on July 13, 2018, which was almost two months after Plaintiff resigned from her job with Defendant. Dkt. No. 53 at 121-24. In this paperwork, Dr. Dohn wrote that Plaintiff was unable to perform her "responsibilities as [DSC]" and estimated that Plaintiff had been incapacitated from "5-7-18 to present" due to her depression and stress. Id. at 122-23.

No. 50-2 ¶¶ 25-28.  On January 30, 2018, Plaintiff attended the candidate's interview.  Id.[5]  Plaintiff sent an email to McMillan later that day, telling McMillan that she had been diagnosed with panic attacks and anxiety, but that with her medications, she would be able to handle the DSC role and did not wish to transfer into the MOA position.  Id. ¶¶ 73-75.

Plaintiff first received a revised version of the disciplinary document on February 6, 2018.  Id. ¶ 30.  This disciplinary document was a warning, and it did not result in loss of pay to Plaintiff or have any other tangible effect.  Id. ¶ 31.  A few months later, on May 4, 2018, Plaintiff had a meeting with Brown and McMillan to discuss Plaintiff's lack of progress since she received the disciplinary document in February.  Id. ¶¶ 32-34.  Plaintiff submitted her letter of resignation on May 7, 2018, and her last day of work was May 23, 2018.  Id. ¶¶ 35-36.  Plaintiff's son graduated from high school on May 26, 2018, and Plaintiff's plan was always to relocate to Florida once her son graduated.  Id. ¶¶ 37-38.

On July 5, 2018, Plaintiff received an email from Colonial Life Insurance, her health insurance company, stating that a request to change her email address from jenlashawn@icloud.com to joneal@sghs.org had been completed.  Id. ¶¶ 80-81.  Plaintiff does

---

[5] The candidate ultimately turned down the MOA position and was hired for a DSC position in a different practice group.  Id. ¶¶ 28-29.

not know who initiated this change of email address, but she ties
Defendant to the change because the new email address on the
account was the email address she previously held when she worked
for Defendant. Id. ¶¶ 82-83. Plaintiff does not know whether any
of her medical records were accessed as a result of this email
address change; regardless, Plaintiff did not suffer any monetary
loss as a result of it. Id. ¶¶ 84-85. Defendant's Information
Technology Systems Administrator states that Plaintiff's work
email address was deactivated on May 23, 2018—the last day of her
employment with Defendant—and no one has reactivated or accessed
Plaintiff's email since then. Id. ¶ 86. Plaintiff filed a charge
of discrimination with the Equal Employment Opportunity Commission
(the "EEOC") on August 22, 2018, claiming that Defendant
discriminated and retaliated against her because of her
disability. Id. ¶ 87. The EEOC issued Plaintiff a Notice of Right
to Sue letter on February 26, 2019. See O'Neal v. Se. Ga. Physician
Assocs., Case No. 2:19-cv-066 (S.D. Ga. May 24, 2019), Dkt. No. 1
at 5.

Plaintiff filed a complaint for employment discrimination
against Defendant[6] on May 24, 2019, claiming that Defendant
retaliated against her on October 23, 2017, January 24, 2018, and
May 4, 2018 because of her disability—namely, "major depression,

---

[6] Plaintiff named Southeast Georgia Physician Associates ("SGPA") as the
defendant in this first complaint; SGPA is the trade name for Cooperative
Healthcare Services, Inc., a subsidiary of Defendant. Dkt. No. 13-1 ¶ 4.

severe panic attacks, severe anxiety, severe high blood pressure, [and] tachycardia." See id., Dkt. No. 1 at 4.   Plaintiff also appears to assert claims for FMLA interference and FMLA retaliation within this complaint. See id., Dkt. No. 1-1 at 1, 3.   On June 3, 2019, Plaintiff filed another complaint against Defendant alleging identity theft, identity fraud, internet fraud, and insurance fraud based on the change of email address on Plaintiff's Colonial Life Insurance account.   See Dkt. No. 1 at 3-4.   Defendant then filed a motion to consolidate the two cases, which the Court granted on October 18, 2019.   Dkt. Nos. 13, 16.   Plaintiff has filed a litany of miscellaneous documents with the Court since the beginning of this case—including letters, medical records, emails, text messages, legal memorandums, and paystubs.   See Dkt. Nos. 10, 19, 21, 37, 40, 42, 47, 48.   Plaintiff appears to assert additional claims within some of these documents, including retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and violations of the False Claims Act, Whistleblower Protection Act, and the Georgia Whistleblower Act.   See Dkt. Nos. 40, 48.

Defendant filed the present Motion for Summary Judgment on March 30, 2020.   See Dkt. No. 50.   Plaintiff filed an "Opposition to Defendant's Motion" as well as a "Motion in Opposition," both of which the Court construes as responses to Defendant's Motion. See Dkt. Nos. 57, 60.

**LEGAL STANDARD**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). Factual disputes that are "irrelevant or unnecessary" are insufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict

10

motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex Corp.</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

The Court will consider each of Plaintiff's claims—including those that were improperly pled[7]—to determine whether a genuine issue of material fact exists such that any of these claims can survive summary judgment.

---

[7] Under Federal Rule of Civil Procedure 15(a), after the time for amending a pleading as a matter of course has passed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Because Plaintiff never obtained consent or requested leave to amend her pleadings, her claims as to Title VII retaliation, the False Claims Act, the Whistleblower Protection Act, and the Georgia Whistleblower Act are not properly pled. <u>See</u> Dkt. Nos. 40, 48. Although Plaintiff is a pro se litigant who "must generally be given an opportunity to amend h[er] complaint," the Court need not grant leave to amend a complaint when it is "futile" because "the complaint as amended would still be . . . immediately subject to summary judgment for the defendant." <u>Darrough v. Allen</u>, No. 1:13-CV-57, 2014 WL 1340681, at *2 (M.D. Ga. Apr. 3, 2014) (quoting <u>Lee v. Alachua Cnty.</u>, 461 F. App'x 859, 860 (11th Cir. 2012)). For the reasons that follow, the Court finds that leave to amend Plaintiff's Complaint would be futile because summary judgment would still be warranted on these claims.

## I.   ADA Discrimination Claims

Plaintiff alleges Defendant discriminated against her in violation of the Americans with Disabilities Act (the "ADA").  Case No. 2:19-cv-066, Dkt. No. 1 at 4; 42 U.S.C. §§ 12112-12117.  The ADA provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  When examining an ADA employment discrimination claim, this Circuit utilizes the "burden-shifting analysis of Title VII employment discrimination claims." Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007) (quoting Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000)). Under this burden-shifting analysis, a plaintiff must first establish a prima facie case of discrimination.  See Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  To establish a prima facie case in an ADA discrimination context, a plaintiff must show: "(1) [s]he is disabled; (2) [s]he is a qualified individual; and (3) [s]he was subjected to unlawful discrimination because of h[er] disability." Clairson, 492 F.3d at 1255-56 (citing Earl, 207 F.3d at 1365).  If a plaintiff can establish a prima facie case, the burden shifts to the defendant to produce "legitimate nondiscriminatory reasons for the adverse

12

employment action." Earley, 907 F.2d at 1081.  If the defendant manages to do so, "the burden shifts back to the plaintiff to establish that these reasons are pretextual." Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)).  However, "the plaintiff always bears the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." Id. (citing Burdine, 450 U.S. at 253).

As to the first prong of Plaintiff's prima facie case, "a person is 'disabled' only if [s]he suffers from a physical or mental impairment that substantially limits one or more of the major life activities." Branscomb v. Sec'y of Navy, 461 F. App'x 901, 903 (11th Cir. 2012) (citing 42 U.S.C. § 12102(2)(A)).  "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. at 903-04 (quoting 29 C.F.R. § 1630.2(i)).  Further, "a plaintiff who performs 'moderately below average' in a life activity is not disabled under the ADA." Gilliard v. Georgia Dep't of Corr., 500 F. App'x 860, 867 (11th Cir. 2012) (citing Rossbach v. City of Miami, 371 F.3d 1354, 1358-59 (11th Cir. 2004)).  Plaintiff states that she is disabled due to "major depression, severe panic attacks, severe anxiety, severe high blood pressure, [and] tachycardia." Case No. 2:19-cv-066, Dkt. No. 1 at 4.  Defendant does not dispute that Plaintiff's medical conditions constitute a disability under the

ADA.  See Dkt. No. 50-1 at 6.  For the purposes of the Motion for Summary Judgment, the Court will assume Plaintiff's anxiety and depression constitute a disability under the ADA.[8]  See Edwards v. WellStar Med. Grp., LLC, No. 1:18-CV-4492, 2020 WL 6293153, at *11 (N.D. Ga. May 15, 2020) (acknowledging that "major depression and anxiety disorder" constitute disabilities under the ADA), report and recommendation adopted, No. 1:18-CV-4492, 2020 WL 6156566 (N.D. Ga. Sept. 8, 2020).

As to the second prong of Plaintiff's prima facie case, "[a]n individual is 'qualified' if she, with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds."  Earl, 207 F.3d at 1365 (citing 42 U.S.C. § 12111(8)).  These "essential functions" are "the fundamental job duties of a position that an individual with a disability is actually required to perform."  Id. (citing 29 C.F.R. § 1630.2(n)(2)(1)).  Defendant does not dispute that Plaintiff was qualified for the DSC Endocrinology position, and the Court will assume the same for the purposes of this Motion.  See generally Dkt. No. 50-1.

Defendant does dispute the third prong of Plaintiff's prima facie case: that Plaintiff was subjected to unlawful

_____

[8]  Because Plaintiff never revisits her allegation that she was discriminated against based on her "severe high blood pressure" and "tachycardia"—and because the record does not support a discrimination claim based upon these medical conditions—the Court will focus on Plaintiff's alleged disability as it relates to her anxiety, panic disorder, and depression.

discrimination because of her disability.  Dkt. No. 50-1 at 6-10.
Liberally construing Plaintiff's pro se pleadings, the Court will
address each alleged form of discrimination in turn.

### A. Failure to Accommodate

Under the ADA, discrimination on the basis of disability
includes an employer's failure to make "reasonable accommodations"
for a disabled employee's physical or mental limitations—unless,
that is, such an accommodation "would impose an undue hardship" on
the employer.  42 U.S.C. § 12112(b)(5)(A); see also 29 C.F.R.
§ 1630.9(a).  An accommodation is "reasonable," and thus required
by the ADA, "only if it enables the employee to perform the
essential functions of the job." Lucas v. W.W. Grainger, Inc.,
257 F.3d 1249, 1255 (11th Cir. 2001).  "The plaintiff bears the
burden of showing that "there was a reasonable accommodation which
would have allowed her to perform the essential functions of the
job" and "the Defendant failed to provide her with a reasonable
accommodation." Cole v. Cobb Cnty. Sch. Dist., No. 1:13-CV-3341,
2014 WL 4545766, at *2 (N.D. Ga. Sept. 12, 2014) (citing Mazzeo
v. Color Resols. Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014)).

Plaintiff alleges that on January 24, 2018, she asked
McMillan, her supervisor, if she could come in later and leave
earlier as an accommodation for her medical conditions—
specifically, Plaintiff's chest pressure, numb arm, and tingling
hands.  Dkt. No. 52 at 39-40; Dkt. No. 50-2 ¶¶ 55, 65.  Plaintiff

wanted this accommodation so she could "take the time off to be able to go to doctors' appointments instead of making them and canceling them." Dkt. No. 52 at 50. Plaintiff says McMillan refused to allow her this "flexible work schedule" and told Plaintiff that, as DSC, Plaintiff had "to be there from eight to five and as needed." Id. at 40. The next day, January 25, 2018, two things happened: first, Plaintiff alleges she was diagnosed with panic attacks and anxiety; second, McMillan suggested that Plaintiff consider transferring to the MOA position in Endocrinology which had less strict attendance requirements. See Dkt. No. 50-2 ¶ 69; Dkt. No. 53 at 56. Plaintiff rejected McMillan's suggestion to transfer to the MOA position on January 30, 2018 by emailing McMillan the following:

> After my doctor's appointment on Thursday [January 25, 2018], I found out what was causing my numbness and tingling with loss of feeling in my fingertips. I have been diagnosed with panic attacks and anxiety. With that being said, I will not be transferring to the MOA position for Endo[crinology]. With the medications I have been prescribed, I will be able to handle and adjust into this role as a DSC.

Dkt. No. 53 at 56. Plaintiff never requested an accommodation again after her January 24, 2018 request for a flexible schedule. Dkt. No. 50-4 ¶ 23.

Plaintiff fails to establish a prima facie case for her failure to accommodate claim because her requested accommodation was not necessary for her to perform the essential functions of

her job.   In failure to accommodate cases under the ADA, the qualification and discrimination prongs of the prima facie case are inextricably intertwined.   Reasonable accommodations must "enable[] the employee to perform the essential functions of the job," Lucas, 257 F.3d at 1255, and essential functions are, in turn, those which an employee must be able to perform to be qualified for the job.   Earl, 207 F.3d at 1365 (citing 42 U.S.C. § 12111(8)).   If a plaintiff is already, sans accommodation, able to perform the essential functions of her job, an accommodation request would not "enable" her to perform those functions.   The relevant essential function seems here to be Plaintiff's punctuality as DSC, and the Court will assume for the purposes of this Motion that punctuality was, in fact, an essential function of this position.   Plaintiff does not assert—and the record does not show—that she was unable to perform the essential functions of the DSC position without an accommodation.   Neither Plaintiff nor Defendant alleges that Plaintiff had punctuality issues before or after Plaintiff requested an accommodation.   Dkt. No. 50-2 ¶ 66. Because Plaintiff requested a flexible work schedule accommodation that she ultimately did not need in order to perform her job, she cannot assert discrimination based on her employer's failure to grant her this unnecessary accommodation.   See Boatwright v. Aspen Prods., Inc., No. 5:17-CV-34, 2018 WL 3028944, at *6 n.8 (M.D. Ga. June 18, 2018) (granting summary judgment for

17

defendant because, among other reasons, "[t]he record . . . suggests that Boatwright's preferred accommodations would have been unnecessary"); Kintz v. United Parcel Serv., Inc., 766 F. Supp. 2d 1245 (M.D. Ala. 2011) (granting summary judgment for defendant where plaintiff does not demonstrate her requested accommodation "was necessary to perform the essential functions of her position"). Although plaintiffs who are qualified for a position *without* accommodations may assert other types of claims under the ADA—including claims based on adverse actions—a failure to accommodate claim is a logical mismatch with such cases.

### B. Hostile Work Environment

Although the Eleventh Circuit has not explicitly determined whether a plaintiff may properly bring a harassment or hostile work environment claim under the ADA, the Court addresses Plaintiff's harassment and/or hostile work environment claim in the case that such a claim is cognizable. See Fikes v. Wal-Mart, Inc., 322 F. App'x 882, 884 n.4 (11th Cir. 2009) ("We express no opinion on whether a hostile work environment claim is cognizable under the ADA."); Stewart v. Jones Util. & Contracting Co. Inc., 806 F. App'x 738, 741 n.2 (11th Cir. 2020) ("Because we ultimately affirm the district court's dismissal of the ADA hostile-work-environment claim, we need not decide whether that cause of action does in fact exist."). To succeed on a hostile work environment claim, "a plaintiff must show that 'the workplace is permeated

with "discriminatory intimidation, ridicule, and insult," . . . that is "sufficiently severe or pervasive to alter the conditions of the [plaintiff]'s employment and create an abusive working environment."'" Wynn v. Paragon Sys., Inc., 301 F. Supp. 2d 1343, 1352 (S.D. Ga. 2004) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Factors to consider when determining whether a workplace is sufficiently hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris, 510 U.S. at 23).

Here, Plaintiff claims that she experienced a hostile work environment while working as the Endocrinology DSC. Plaintiff says McMillan harassed her in the following ways: by laughing and "bl[owing] it off" when Plaintiff asked for time off because of her medical conditions; making fun of Plaintiff when she did breathing exercises for her anxiety; and telling Plaintiff she was being "ridiculous" and to "suck it up" when Plaintiff did such exercises. Dkt. No. 52 at 50. Plaintiff claims McMillan mocked her in this way "on a regular basis." Id. Plaintiff submitted a complaint to the Federal Bureau of Investigation's Internet Crime Complaint Center in which she alleges that McMillan and Brown harassed Plaintiff "due to [her] reporting violations and wrong-doings to [Defendant's] Compliance Alert Line." Dkt. No. 1-1 at

19

14.   Plaintiff also characterizes the way the doctors and MOAs interacted with one another in the Endocrinology practice as "hostile." Dkt. No. 52 at 18.  When asked to describe "the hostile environment issue" in her deposition, Plaintiff responded that "[the MOAs] were [always] bickering, . . . arguing," and "almost fighting with each other." Id.  When asked why they were fighting, Plaintiff explained that "[o]ne M[O]A was accusing the other M[O]A of not doing their job," including two MOAs in particular—Candace and Katrina.  Id. at 19.   Plaintiff alleges another MOA, Tashina, "created a hostile issue between the front office staff." Id. at 21.  When asked whether Plaintiff simply means "conflict" when she uses the term "hostile environment," Plaintiff said "[y]es." Id. at 22.   Finally, Plaintiff claims that an Endocrinology doctor, Dr. Badre, caused a hostile environment by being "abusive" to everyone in the office, including drug representatives and all employees.  Id. at 23–24.

Plaintiff uses the term "hostile environment" loosely.  Most of the conduct Plaintiff describes as "hostile" involves Endocrinology employees' interactions with one another in general—and not toward Plaintiff herself.  For example, the MOAs' bickering and fighting with one another is clearly not "discriminatory intimidation, ridicule, and insult" based on Plaintiff's disability.  See Wynn, 301 F. Supp. 2d at 1352 (quoting Harris, 510 U.S. at 21).  These altercations between MOAs seemingly did

not involve Plaintiff at all.  Nor does Dr. Badre's alleged "abusive" treatment of everyone who worked in the Endocrinology practice constitute a hostile work environment; Plaintiff's allegation that Dr. Badre treated *everyone* poorly belies any contention that Dr. Badre harassed Plaintiff individually and *because of* Plaintiff's disability.  See Dkt. No. 52 at 23. Plaintiff "has presented no evidence, including her own testimony, that her [disability] was the motivating factor behind" any of those altercations.  Wynn, 301 F. Supp. 2d at 1352.

McMillan's making fun of Plaintiff's anxiety, breathing exercises, and request for time off, as a matter of law, do not rise to the level of a hostile workplace.  Although Plaintiff may have subjectively felt that McMillan's remarks were hostile, "[t]o be actionable, the behavior must [also] be . . . objectively hostile or abuse, as judged by a reasonable person."  See Dick v. CRC Ins. Servs., Inc., No. CV 08-PWG-910-S, 2009 WL 10687917, at *14 (N.D. Ala. Dec. 14, 2009) (citing Harris, 510 U.S. at 21-22), report and recommendation adopted sub nom. Dick v. Rehau, Inc., No. 2:08-CV-0910-LSC, 2010 WL 11561387 (N.D. Ala. Jan. 21, 2010).  Although Plaintiff alleges McMillan made fun of her anxiety on a "regular basis," a reasonable jury could not find that the conduct Plaintiff describes was "sever[e]" or "physically threatening or humiliating," nor that it "unreasonably interfere[d] with [Plaintiff]'s work performance."  Id. (citing

Harris, 510 U.S. at 23); see Dick, 2009 WL 10687917, at *14
(granting summary judgment for employer where the employer's
"isolated comments were hurtful to the plaintiff," but "they were
not sufficiently severe to create an abusive working
environment"); Dockery v. Nicholson, 170 F. App'x 63 (11th Cir.
2006) (affirming summary judgment for employer in hostile work
environment case where employer "grabbed [plaintiff's] arm,"
"wanted to get rid of [plaintiff]," and "made demeaning comments
to [plaintiff] regarding his disability").  To the extent such a
claim is cognizable under the ADA, Plaintiff shows no genuine issue
of material fact as to her hostile work environment claim.

### C. Retaliation

"To establish a *prima facie* case of retaliation under the
ADA,[9] a plaintiff must show that: (1) she participated in a
protected activity; (2) she suffered an adverse employment action;
and (3) there was a causal connection between the plaintiff's
participation in the protected activity and the adverse employment
action." Bagwell v. Morgan Cnty. Comm'n, 676 F. App'x 863, 869
(11th Cir. 2017) (citing Frazier-White v. Gee, 818 F.3d 1249, 1258
(11th Cir. 2016)).  To satisfy the first element, a plaintiff must

---

[9] Plaintiff mentions retaliation in violation of Title VII in one of her
memoranda, but she does not allege discrimination on the basis of "race, color,
religion, sex, or national origin" anywhere else, nor does the record support
any issue of material fact as to such a claim.  See Dkt. No. 48 at 2; 42 U.S.C.
§ 2000e-2.  To the extent Plaintiff asserts a Title VII retaliation claim, this
claim fails and is subject to summary judgment in Defendant's favor.

"have a good faith, objectively reasonable belief that h[er] activity is protected by the [ADA]." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998). Protected activity includes making requests for reasonable accommodations. Id. To satisfy the second element, a plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment." Crawford v. Carroll, 529 F.3d 961, 970-71 (11th Cir. 2008) (quoting Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001)). To constitute an adverse action, an employer's action must have the potential "to deter a reasonable employee from pursuing a pending charge of discrimination or making a new one." Id. at 974 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61 (2006)). However, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Palmer v. McDonald, 624 F. App'x 699, 702 (11th Cir. 2015) (quoting Burlington, 548 U.S. at 68).

Many of the reasons for which Plaintiff claims she was retaliated against are completely unrelated to her disability. For example, Plaintiff claims Defendant retaliated against her because she "report[ed] violations and wrong-doing to the health system Compliance Alert Line." Dkt. No. 1-1 at 13; see also Dkt. No. 10 at 3 ("I tried . . . to get help and attention for all the patients [that] had been suffering," and "[t]he end result[ was that] I suffered severe retaliation, harassment, and

23

discrimination."); Dkt. No. 52 at 35, 52.  Plaintiff's allegations of retaliation based on the patient issues she found and raised with the Endocrinology practice are not within the realm of her ADA claim, as they have nothing to do with her disability.

Plaintiff also alleges she was retaliated against because she requested a flexible schedule.  See Case No. 2:19-cv-066, Dkt. No. 1-1 at 1.  However, even if this request for accommodation constituted a protected activity, Plaintiff suffered no adverse action as a result.  The actions Plaintiff alleges Defendant took in response to her request for accommodation include McMillan's threatening to replace Plaintiff and issuing Plaintiff a write-up, Defendant's creating a hostile work environment, and Plaintiff's ultimate constructive termination.  Id.  Taking these one at a time, the record does not support Plaintiff's contention that her job security was threatened, and even if it did, a nebulous threat to Plaintiff's job security does not constitute "a serious and material change in the terms, conditions, or privileges of employment."  See Crawford, 529 F.3d at 970-71 (quoting Davis, 245 F.3d at 1239).  Even if McMillan suggested that someone may replace Plaintiff as DSC, this suggestion had no "tangible, negative effect" on Plaintiff's employment.  See Branscomb v. U.S. Dep't of the Navy, 556 F. App'x 910, 911 (11th Cir. 2014).  Nor did the "write-up" have a tangible effect on Plaintiff's employment.  McMillan issued a "Corrective Action Plan" to

24

Plaintiff on February 6, 2018.  Dkt. No. 53 at 57-58.  This plan, which details Plaintiff's failure to respond timely to requests and follow through on tasks, among other issues, constituted a "Written Warning" and clarified "that additional performance problems will lead to progressive corrective action."  Id. McMillan stated that this written warning "did not result in a loss of pay for Plaintiff and was simply a coaching opportunity." Dkt. No. 50-2 ¶ 31.  Plaintiff does not allege otherwise, nor does she demonstrate how this plan had any impact on the terms, conditions, or privileges of her employment.  See Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 184 (11th Cir. 2011) (holding plaintiff "failed to show that the Documentation of Counseling was a material injury or harm" because "[t]here [wa]s no evidence that the Documentation affected her salary or job status").

Plaintiff's hostile work environment claim fails for the purposes of her retaliation claim just as it did for her discrimination claim.  See supra section I.2.  None of the conduct Plaintiff describes, including McMillan's dismissiveness when Plaintiff requested a reasonable accommodation, was "severe, physically threatening or humiliating, or unreasonably interfered with [Plaintiff's] job performance."  Palmer, 624 F. App'x at 704. Moreover, Plaintiff cannot establish a constructive discharge claim because it is a "higher standard" than that of a hostile

25

work environment.  See id.; see also Hipp v. Liberty Nat. Life
Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) ("To prove
constructive discharge, the plaintiff must demonstrate a greater
severity or pervasiveness of harassment than the minimum required
to prove a hostile working environment." (quoting Landgraf v. USI
Film Prods., 968 F.2d 427, 430 (5th Cir. 1992), aff'd, 511 U.S.
244 (1994))).  Plaintiff fails to demonstrate a genuine issue of
material fact as to her retaliation claim under the ADA.

**II.  FMLA Claims**

Plaintiff also alleges that Defendant retaliated against her
for requesting leave under the FMLA and interfered with her ability
to take such leave.  Case No. 2:19-cv-066, Dkt. No. 1-1 at 1, 3;
Dkt. No. 1-1 at 14.  The FMLA grants twelve weeks of leave to any
eligible employee who is suffering from "a serious health condition
that makes the employee unable to perform the functions of the
position."  29 U.S.C. § 2612(a)(1)(D).  The FMLA prohibits
employers from "interfer[ing] with, retrain[ing], or deny[ing] the
exercise of or the attempt to exercise, any right provided under
[the FMLA]" as well as "discharg[ing] or in any other manner
discriminat[ing] against any individual for opposing any practice
made unlawful by [the FMLA]."  29 U.S.C. § 2615(a).  The Eleventh
Circuit has recognized that these provisions create "two types of
claims: interference claims, in which an employee asserts that
h[er] employer denied or otherwise interfered with h[er]

substantive rights under the Act, and retaliation claims, in which an employee asserts that h[er] employer discriminated against h[er] because [s]he engaged in activity protected by the Act." Lee v. U.S. Steel Corp., 450 F. App'x 834, 837 (11th Cir. 2012).

However, "[a]s a prerequisite for either cause of action, the employee must establish that she qualified for FMLA leave." Landry v. Howell, No. 5:14-CV-00167, 2016 WL 5387629, at *3 (M.D. Ga. Sept. 26, 2016) (citing Hurley v. Kent of Naples, Inc., 746 F.3d 1161, 1168 (11th Cir. 2014)). Additionally, "[a]s should be apodictic," in order to establish that she was qualified for FMLA leave, a plaintiff must "first demonstrate that she had a 'serious health condition.'" Hegre v. Alberto-Culver USA, Inc., 485 F. Supp. 2d 1367 (S.D. Ga. 2007) (citing Wilson v. NHB Indus., Inc., 219 F. App'x 851, 852 (11th Cir. 2007)). The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). There is no evidence of inpatient care in this case, so the Court will focus on the second prong. While "the FMLA does not define 'continuing treatment by a health care provider,' . . . the Department of Labor has filled the gap with a regulation enumerating several qualifying touchstones." Pivac v. Component Servs. & Logistics, Inc., 570 F. App'x 899, 902 (11th Cir. 2014).

Relevant here is the regulation's inclusion of "[a]ny period of incapacity or treatment for such incapacity due to a *chronic serious health condition*." 29 C.F.R. § 825.115(c) (emphasis added). A "chronic serious health condition" is defined as one that "[r]equires periodic visits" for treatment, "[c]ontinues over an extended period of time," and "[m]ay cause episodic rather than a continuing period of incapacity." Id.

While Plaintiff alleges that she was diagnosed with "panic attacks and anxiety" by Dr. Dohn on January 25, 2018, the medical records from that visit do not explicitly contain such a diagnosis. Compare Dkt. No. 53 at 56 with id. at 148. Plaintiff contends that Dr. Dohn prescribed her several medications during this visit, but the doctor's notes from that appointment also do not list these prescriptions. See id. at 148. One medical record from an appointment with Dr. Certain on April 20, 2018, does list the medications Plaintiff alleges Dr. Dohn prescribed her as "Current Medications," but Dr. Certain also does not diagnose Plaintiff with panic attacks, anxiety, or depression according to this record. See Dkt. No. 10-2 at 6-8. Instead, Dr. Certain diagnoses Plaintiff with "Chest pain," "Hyperventilation syndrome," "Tachycardia," and "Tyhromegaly." Id. at 7. Not until Dr. Dohn's notes from a June 18, 2018 appointment—after Plaintiff had already resigned from Defendant's employment—does Dr. Dohn explicitly diagnose Plaintiff with depression, anxiety, and stress and

prescribe her Trintellix for depression and Xanax for anxiety. Id. at 10. Finally, not until two months after Plaintiff's resignation does Dr. Dohn fill out the FMLA paperwork in which he states Plaintiff was unable to perform her "responsibilities as [DSC]." Dkt. No. 53 at 121-24. In this paperwork, Dr. Dohn estimates that Plaintiff has been incapacitated from "5-7-18 to present" due to her depression and stress but does not project future periods of incapacitation. Id. at 123.

While the conflicting accounts of when, exactly, Plaintiff was diagnosed with depression and anxiety may create an issue of fact as to whether Plaintiff had a disability or a chronic health condition, "the FMLA only protects leave for '[a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition.'" Hurley, 746 F.3d at 1168 (quoting 29 C.F.R. § 825.115(c)). The FMLA does not protect "any leave that is medically beneficial . . . simply because the employee has a chronic health condition." Id. There is no evidence demonstrating that Plaintiff was incapacitated such that she needed to take leave due to her anxiety or depression while she was employed by Defendant. Plaintiff herself never alleges that she needed leave because her conditions prevented her from performing her job duties. Instead, the evidence shows that Plaintiff wanted time off so she could attend doctors' appointments, which do not constitute periods of incapacity in this instance. Dkt. No. 50-2

¶¶ 64-65.  Dr. Dohn also never advised Plaintiff to stop working while she was employed by Defendant. While Dr. Dohn states in Plaintiff's post-resignation FMLA paperwork that Plaintiff was incapacitated from May 7, 2018 on, Plaintiff completed two weeks of employment before May 23 without any absences or alleged incapacity.  Dkt. No. 53 at 123; Dkt. No. 50-2 ¶¶ 35-36.  Dr. Dohn's post-hoc statement that Plaintiff was incapacitated from May 7, 2018 "to present" does not undermine the fact that Plaintiff was not incapacitated when she worked for Defendant from May 7, 2018 to May 23, 2018.  Plaintiff never alleges that she had to leave work or was unable to perform the functions of her DSC position because of her conditions—during any time prior to May 7 or after May 7—and this "absence of evidence to support that [P]laintiff [wa]s unable to perform job functions is fatal to both [her] interference and retaliation claims." Barker v. R.T.G. Furniture Corp., No. 808-CV-484-T-33MAP, 2009 WL 1767562, at *5 (M.D. Fla. June 22, 2009), aff'd, 375 F. App'x 966 (11th Cir. 2010); see also Sessom v. WellStar Hosp., No. 1:08-CV-2057, 2010 WL 11493776, at *8 (N.D. Ga. Feb. 10, 2010) (granting summary judgment for defendant where "Plaintiff d[id] not present evidence that her health care provider found that she was unable to work at all or was unable to perform any one of the essential functions of her position *at the time of her absence*" (emphasis added)), report and recommendation adopted, No. 1:08-CV-2057, 2010 WL 11493775

30

(N.D. Ga. Mar. 30, 2010); <u>Curry v. Neumann</u>, No. 98-8969-CIV, 2000 WL 1763842, at *5 (S.D. Fla. Apr. 3, 2000) (finding that plaintiff's doctor's notes "failed to state that . . . she could not perform the duties of a clerk" during the three months she was absent from work and "were therefore insufficient certification to justify FMLA leave"); <u>Hegre</u>, 485 F. Supp. 2d at 1378 ("The absence of any evidence to support Plaintiff's claim that she requested leave because an adjustment in her medications would leave her unable to perform her job functions is fatal to Plaintiff's FMLA interference and retaliation claims.").

Because Plaintiff was never absent or incapacitated due to her condition, Plaintiff's condition did not constitute a "serious health condition involving continuing treatment by a health care provider" for the purposes of the FMLA.  There is no genuine issue of material fact as to whether Plaintiff was entitled to FMLA leave, and summary judgment for Defendant is therefore appropriate as to Plaintiff's FMLA claims.

**III. Whistleblower Claims**

For the first time in what is titled "Plaintiff Response"[10] and "Plaintiff's Response Post Settlement Conference," Plaintiff seems to allege several whistleblower claims, including the False Claims Act, the Whistleblower Protection Act, and the Georgia

---

[10] To what Plaintiff responds it is unclear.  <u>See generally</u> Dkt. No. 40.

Whistleblower Act.  <u>See</u> Dkt. Nos. 40, 48.[11]  Plaintiff claims that she "has been retaliated, harassed, and discriminated against for reporting illegal and improper conduct that . . . occurred during her time of employment with [Defendant]." Dkt. No. 48 at 1.  This "illegal and improper conduct," the Court presumes, includes the issues Plaintiff found with patient prescriptions, pre-authorizations for those prescriptions, and doctors' credentials at the Endocrinology practice.  The Court examines these whistleblower claims in turn.

### A. False Claims Act

The False Claims Act ("FCA") prohibits fraudulent submissions to the government, and it provides relief to employees who are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" because of the employee's acts done "to stop . . . violations of this subchapter."  31 U.S.C. §§ 3729, 3730(h)(1).  "[T]he internal reporting of fraudulent activity to a supervisor" is considered "to be a step in furtherance of uncovering fraud, and thus protected under the FCA." <u>Marbury v. Talladega Coll.</u>, No. 1:11-CV-03251, 2014 WL 234667, at *7 (N.D. Ala. Jan. 22, 2014).  However, such an internal report "must specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct."  <u>Id.</u> at *8.

---

[11] <u>See</u> <u>supra</u> n.4 and accompanying text.

Here, Plaintiff's internal and external reporting of issues in Defendant's Endocrinology practice did not involve fraudulent claims for federal funds. Instead, Plaintiff consistently reported issues with patients' prescriptions, doctors' credentials, and the like; she says in one letter to Defendant that "since May 2017," she had been "reporting patients' lives compromised and at risk." Dkt. No. 53 at 134. These reports of "general misconduct" are not encompassed by the Federal Claims Act. See Hale v. Moreland Altobelli Assocs., Inc., No. 1:14-CV-00065, 2014 WL 12235187, at *6 (N.D. Ga. Sept. 4, 2014) ("Nothing in Plaintiff's complaints rise above the level of 'suggestions' for improvement or general concerns about improper conduct" and therefore do not constitute "protected activity").

## B. Whistleblower Protection Act

To the extent Plaintiff asserts a Whistleblower Protection Act ("WPA") claim, Plaintiff is clearly not protected by this statute. "The WPA provides protection to *federal* employees against agency reprisal for whistleblowing activities." Hendrix v. Snow, 170 F. App'x 68, 78 (11th Cir. 2006); see also 5 U.S.C. § 2105(a). Plaintiff was not a federal employee when employed by Defendant, so Plaintiff does not have a WPA claim against Defendant.

### C. Georgia Whistleblower Act

Finally, Plaintiff is also not protected by the Georgia Whistleblower Act ("GWA") because the GWA only applies to "public employers" and "public employees."   See O.C.G.A. § 45-1-4. Plaintiff was not a public employee, nor was Defendant a public employer.   Summary judgment is accordingly appropriate for Defendant as to all of Plaintiff's whistleblower claims.

## IV.  Claims Related to Plaintiff's Life Insurance Account

Plaintiff asserts a variety of claims related to the alleged unauthorized access of her Colonial Life Insurance account, including "Identity Theft," "Identity Fraud," "Internet Fraud," "Insurance Fraud," and a HIPAA violation.   Dkt. No. 1 at 3, 5. Plaintiff does not cite any statute or common law on which she bases these claims, so the Court construes her pro se pleadings liberally in determining the potential bases for these claims.

### A. Identity Theft/Fraud Claims

Plaintiff claims her "identity was used and compromised; to gain access to [her] Colonial Life account" on July 5, 2018, when she received an email telling her that her email address on her Colonial Life account had been changed.   Id. at 5.   Plaintiff alleges that "healthcare professionals" employed by Defendant "search[ed] the Human Resources database to retrieve [Plaintiff's] personal information to make the change of addresses [sic]" and thereby gained access to Plaintiff's medical records and her

children's personal information, including social security numbers. Id.

It is possible that Plaintiff seeks to assert a claim for theft by deception under O.C.G.A. § 16-8-4 and/or identity fraud under O.C.G.A. § 16-9-121. However, "neither of the[se] statutes . . . creates a private cause of action for damages arising from their violation." Floyd v. Manuel, No. 1:20-CV-02974, 2020 WL 4875428, at *2 (N.D. Ga. July 22, 2020). Plaintiff therefore cannot maintain these causes of action. See id. (noting that "the violation of a criminal statute on its own 'does not create a civil cause of action for damages in favor of the victim or anyone else'" (quoting Anthony v. Am. Gen. Fin. Servs., 697 S.E.2d 166, 172 (Ga. 2010))).

It is also possible that Plaintiff asserts a claim under the federal identity theft statute, the Identity Theft and Assumption Deterrence Act of 1998 ("TADA"). See 18 U.S.C. § 1028. However, this statute is also "criminal in nature and provides no civil cause of action or civil remedy." Rana v. Bank of N.Y. Mellon, No. 1:15-CV-03804, 2016 WL 10998577, at *5 (N.D. Ga. May 24, 2016), report and recommendation adopted, No. 1:15-CV-3804, 2016 WL 10999678 (N.D. Ga. July 1, 2016). Plaintiff has not identified—nor can the Court find—a basis on which she may assert an identity theft or fraud claim in this civil suit against Defendant. Summary judgment for Defendant is therefore appropriate on these claims.

**B. Internet Fraud Claims**

Plaintiff claims that "Administrative, Management, and Human Resources willingly committed this crime by submitted [sic] a request; to reactivate [her] email address account by submission to the Information Systems Department." Dkt. No. 1 at 5. This request, she says, was "not initiated; nor authorized by [her]," and "[w]homever submit [sic] this request to Colonial Life gained access to [her] account with [her] medical records without [her] knowledge and authorization." Id.

Plaintiff might be asserting a claim under O.C.G.A. § 16-9-93, which defines the crimes of "computer theft," "computer trespass," and "computer invasion of privacy." Id. §§ 16-9-93(a)-(c). All of these crimes involve the use of a computer or computer network "with knowledge that such use is without authority." Id. Subsection (g)(1) of this statute allows "[a]ny person whose property or person is injured by reason of a violation of any provision of this article" to "sue therefor and recover for any damages sustained." Id. § 16-9-93(g)(1). However, Plaintiff provides no evidence at all that Defendant accessed her Colonial Life Insurance account. Plaintiff "does not know who changed the email address on her account, who initiated it, when it was initiated, or how it was initiated." Dkt. No. 50-2 ¶ 82. Plaintiff admits that the only reason she ties Defendant to this notification of email address change is that the new email address was the one

36

she previously held while employed by Defendant.  Id. ¶ 83.  In fact, the evidence shows that Plaintiff's email address was deactivated on May 23, 2018 and has not been activated since.  Id. ¶ 86.  Plaintiff also "does not know if any of her records were accessed," nor did she "suffer any monetary loss because of the change in her email address."  Id. ¶¶ 84, 85.  Plaintiff's speculation that Defendant is responsible for this notification of a change of email address, coupled with a lack of damages, fail to create a genuine issue of material fact as to whether she may recover under O.C.G.A. § 16-9-93.

Plaintiff also appears to assert an invasion of privacy tort based on this allegation.  Dkt. No. 1 at 5.  While "[t]he tort of intrusion upon seclusion or solitude is one of the four categories of invasion of privacy claims," Plaintiff "must demonstrate that she was subjected to a 'physical intrusion analogous to a trespass.'" Ass'n Servs., Inc. v. Smith, 549 S.E.2d 454, 458 (Ga. Ct. App. 2001) (quoting Davis v. Emmis Publ'g Corp., 536 S.E.2d 809 (Ga. Ct. App. 2000)).  Again, Plaintiff brings forward no evidence that Defendant intruded upon her privacy, let alone that it did so physically.  Summary judgment is appropriate for Defendant as to this claim.

Finally, Plaintiff possibly asserts a claim under the Stored Communications Act when she claims Defendant is responsible for "Internet Fraud."  See 18 U.S.C. § 2701 et seq.  This federal

statute makes it a crime to access without authorization a facility through which an electronic communication service is provided, and it provides a civil cause of action for those who have been aggrieved by such a violation. Id. §§ 2701(a), 2707(a). For the same reasons Plaintiff has not demonstrated an issue of fact as to the other internet fraud claims, Plaintiff fails to demonstrate one here; nothing in the record suggests that Defendant accessed her insurance account. All of Plaintiff's internet fraud claims are subject to summary judgment in favor of Defendant.

### C. Insurance Fraud Claim

It is possible that Plaintiff asserts her "Insurance Fraud" claim pursuant to O.C.G.A. § 33-1-9, which defines the crime of insurance fraud. However, "[u]nder the Insurance Code, [P]laintiff's sole remedy for the violations she alleges is to lodge an administrative complaint with the Insurance Commissioner." Garrett v. Autonation Fin. Servs. Corp., No. 1:07-CV-2033, 2008 WL 11335007 (N.D. Ga. May 23, 2008) (citing Ga. Comp. R. & Regs. 120-2-47-.11 (2008)).

Plaintiff may also be claiming that Defendant committed the common law tort of fraud. See O.C.G.A. §§ 23-2-52, 51-6-2. However, even if fraud did not carry with it a heightened pleading standard, see Fed. R. Civ. P. 9(b), Plaintiff would fail to demonstrate an issue of material fact as to fraud. Under Georgia law, a plaintiff asserting the common law tort of fraud must

demonstrate five things: "(1) false representation by defendant; (2) with scienter, or knowledge of falsity; (3) with intent to deceive plaintiff or to induce plaintiff into acting or refraining from acting; (4) on which plaintiff justifiably relied; (5) with proximate cause of damages to plaintiff." Rust v. Boswell, No. 1:11-CV-03404, 2013 WL 12099655, at *17 (N.D. Ga. Oct. 4, 2013) (quoting J'Carpc, LLC v. Wilkins, 545 F. Supp. 2d 1330, 1340 (N.D. Ga. 2008)), report and recommendation adopted, No. 1:11-CV-3404, 2014 WL 12543898 (N.D. Ga. Feb. 28, 2014). Plaintiff has not introduced any facts tending to demonstrate that Defendant made a false representation to Plaintiff regarding her Colonial Life Insurance account. Summary judgment for Defendant is therefore also warranted as to Plaintiff's insurance fraud claims.

### D. HIPAA Claim

Plaintiff also claims Defendant "truly violated HIPPA [sic]," the Heath Insurance Portability and Accountability Act ("HIPAA"), by accessing the medical records within her Colonial Life account. Dkt. No. 1 at 5. However, the Eleventh Circuit has "decline[d] to hold that HIPAA creates a private cause of action." Sneed v. Pan Am. Hosp., 370 F. App'x 47, 50 (11th Cir. 2010). Plaintiff therefore may not proceed on her HIPAA claim against Defendant.

In sum, Plaintiff has failed to demonstrate a genuine issue of material fact as to any of her claims, and summary judgment for Defendant on all claims is therefore appropriate.

**CONCLUSION**

For the above reasons, Defendant's Motion for Summary Judgment, dkt. no. 50, is **GRANTED** in its entirety. The Clerk is **DIRECTED** to enter judgment for Defendant and close this case, as well as member case no. 2:19-cv-66, with which this case was consolidated.

**SO ORDERED**, this 14th day of January, 2021.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA